UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------X

KEITH CARLSON,

                Plaintiff,                              COMPLAINT

    - against -

NORTHWELL HEALTH, INC.,

                Defendant.
---------------------------------------X

        Plaintiff Keith Carlson by his attorneys, Vladeck, Raskin & Clark, P.C., complains of defendant Northwell Health, Inc., as follows:

## NATURE OF CLAIMS

        1.      Carlson is an accomplished healthcare executive. Unfortunately, the Neurology Division at Northwell was led by managers who were fixated on age. As soon as Carlson's supervisor learned that he was in his mid-50s, she began to apply age-based stereotypes to Carlson, as she did with others. She also began to level false accusations about Carlson's performance, ultimately firing him for pretextual reasons.

        2.      Carlson brings this action to remedy discrimination in violation of the Age Discrimination in Employment Act, as amended, 29 U.S.C. § 621 et seq. ("ADEA"); the New York State Human Rights Law ("State Law"), N.Y. Exec. Law § 296 et seq., and the New York City Human Rights Law ("City Law"), New York City Administrative Code, § 8–101 et seq.

        3.      Carlson seeks injunctive and declaratory relief, compensatory, liquidated and punitive damages, and all other appropriate equitable and legal relief pursuant to the ADEA, State Law, and the City Law.

1132817 v1

JURISDICTION AND VENUE

4. Jurisdiction of this Court is proper under 28 U.S.C. § 1331 because plaintiff has brought claims pursuant to the ADEA.

5. This Court has supplemental jurisdiction over plaintiff's State Law and City Law claims pursuant to 28 U.S.C. § 1367 because these claims closely relate to his ADEA claims, having arisen out of a common nucleus of operative facts, such that all claims form part of the same case or controversy.

6. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Northwell resides in New York City and because a substantial part of the events or omissions giving rise to the claims occurred in New York City.

7. Pursuant to Section 8-502(c) of the New York City Human Rights Law, Carlson will cause to be served a copy of this Complaint on the City of New York Commission on Human Rights and the Corporation Counsel of the City of New York.

8. On April 30, 2020, Carlson filed a charge against Northwell alleging unlawful age discrimination with the United States Equal Opportunity Employment Commission (the "EEOC"). On or about August 27, 2020, the EEOC issued plaintiff a notice informing him of the right to sue under the ADEA.

PARTIES

9. Carlson is a resident of the State of New York.

10. Northwell is a New York non-profit corporation that provides healthcare services throughout New York City, Westchester, and Long Island.

FACTUAL ALLEGATIONS

11. Carlson is 57 years old.

12. Carlson earned a B.S. In Biology from Tulane University in 1985. He earned an MBA from Columbia Business School in 1994.

13. Prior to joining Northwell, Carlson worked in the healthcare field for twenty years in management-level administrative and marketing positions, including at major healthcare providers such as New York Presbyterian/Cornell Medical Center, NYU Langone Health, and the Hospital for Special Surgery.

14. Northwell hired Carlson as Senior Administrative Director for the Western New York region in the Neurology Division. He began work on May 28, 2019.

15. Throughout Carlson's employment, he reported to Dinelia Ortiz, Vice President of Neurology. The Vice Chair of Neurology during this time was Dr. Derek Chong.

16. Carlson was responsible for four facilities—three in New York City and one in Westchester—and moved from office to office, sometimes working on a shared card table.

17. During Carlson's first several weeks at Northwell, Ortiz did not criticize the timeliness or quality of his work.

18. In mid-July 2019, Carlson and Ortiz were at Phelps Hospital in Westchester. Carlson took a 15-minute lunch break. During his break, he gazed out the cafeteria window at the mountains and the river. Ortiz was present. After lunch, Carlson rode the elevator alone with Ortiz. She asked me how old he was. He told her that he was 56 years old.

19. When Carlson told one of the managers he supervised about Ortiz asking his age, the manager said that the manager and others at Northwell had assumed Carlson was 10-15 years younger.

20. In mid-July, Carlson was sharing a card table with David Figueroa, a Manager of Neurology who reported to him, in Chong's office. Figueroa is in his early forties.

Chong was also present. Chong asked, "How old do you think [a certain employee] is?" Figueroa made a comment about the employee in question having a 16-year-old daughter, and Figueroa and Chong had a conversation trying to determine the employee's age. Carlson told them that he did not think a discussion about the employee's age was appropriate. Chong and Figueroa had a similar conversation about that same employee's age on another occasion in Carlson's presence. That employee later told Carlson that she was 62 years old.

21. On or about July 25, 2019, Carlson had a meeting with Ortiz. She began the meeting by commenting on Carlson looking at the mountain and river during his lunch break. She then made a series of statements such as, "You have to be highly energetic for this job," and "You need to have a lot of stamina." She said that Carlson was someone who seems to like to be calm and sit in a quiet office. She also noted the need to cope with not having air conditioning and moving from office to office. Earlier in July, on a day when the temperature in the office was close to 80, Carlson had told Ortiz that numerous secretaries and doctors were complaining about the lack of air conditioning that day, and that Carlson was hot as well. Carlson had the impression that now that Ortiz knew his age, she thought of him as weaker and as someone looking to slow down.

22. In the July 25 meeting, Ortiz also claimed that she had issues with Carlson's performance. This was the first time she had ever suggested she had any such issues. She said that Carlson had to develop relationships with the neurologists and said they did not think they had relationships with him. Although Carlson had only been at Northwell less than two months, he had already established good relationships with all the neurology doctors and administrators. Carlson believed that he was very well-liked and respected. Carlson told Ortiz that he did have relationships, that he had worked on projects with three doctors, spoke to them every day, met with

doctors at other locations, and even socialized with five or six of them. Ortiz did not criticize Carlson's work during this meeting. Ortiz said that as a result of the alleged issue with his relationships, she was extending his three-month probation for an additional three months. Carlson told Ortiz that he was more than willing to do anything she wanted, but that he did not understand what she wanted. She said she agreed that what she wanted was unclear and said that she would explain again and give him ideas on July 29, 2019. She never did so even after Carlson asked several times.

23. Carlson also had a phone call with Ortiz on July 25 about his projects. One of the projects Ortiz had assigned to him was getting a newly-hired doctor, Dr. Steven Mandel, set up and integrated, including handling extensive clerical tasks. During their call, Carlson told Ortiz that he was spending about 30-40% of his time addressing issues with Mandel's office. He said that much of what he had to do for Mandel was clerical, but that it took time away from his more important projects. Ortiz twice said that Mandel is old, that is he over 70. She said that Mandel should have retired rather than joining Northwell from his private practice.

24. Ortiz began to inundate Carlson with unnecessary, detailed questions about minor matters, taking time away from his actual work.

25. In mid-September, Ortiz sat next to Carlson in an office where four other employees were based. While the two of them were alone, Ortiz looked at her computer screen and said that she was "disheartened" that Carlson was not working out. Carlson responded that he was working very hard and had accomplished a lot.

26. On or about September 23, 2019, Ortiz told Carlson that he was probably not going to pass probation. She said that he should work late, like Figueroa. Carlson told her that Figueroa did not work late, but sometimes stayed later in the office waiting to meet friends he was

seeing after work.  Carlson also noted that Figueroa wasted a lot of time during the day, which Carlson did not do. Carlson had told this to Ortiz on several occasions.  She agreed that Figueroa wasted a lot of time and told Carlson to address it with him; Carlson did so.  Carlson also worked past 5 p.m. just about every day, as Ortiz knew, and worked from home at night, answering emails and taking phone calls, including late night calls from Ortiz.

27. On or about September 26, 2019, in a phone call with Ortiz about the significant amount of work Carlson was doing for Mandel, Ortiz again repeatedly said that Mandel was old and should have retired.  She said she did not know why he was still working.  She added that he probably would not be at Northwell too much longer because he was old and from a "different era."

28. On October 18, 2019, Ortiz fired Carlson.  She said that she needed someone from within Northwell who understood its landscape and systems.  Carlson asked her to give him a year, reminding her that she had told him many times it took her five years to master all that information.  She refused.  Ortiz and the managers had previously told Carlson it would likely take more than a year for him to be fully up to speed with all the programs and navigating Northwell.  Carlson took internal courses to better understand the Northwell systems. When he was being interviewed and after he was hired, Ortiz had said a number of times that she could not hire an internal candidate because it would prejudice either the ambulatory or hospital side, depending on where the candidate came from.

29. In the October 18, 2019 meeting, Ortiz admitted that Carlson had done well with some of his projects, but said that it was "too late."  Ortiz said that she made the decision to fire Carlson, in consultation with Chong and the Chair of Neurology, Dr. Souhel Najjar.  Carslon

responded that ever since she asked and learned his age she had been treating him unfairly and looking to build a case to fire him.

30. After Carlson was dismissed, a number of the doctors, Vice Presidents, and Senior Directors reached out to him by phone and text, saying that they would miss him. Among other things, they said they were "shocked" and "very disappointed," as they thought Carlson was doing a great job and that he had made the department a "more enjoyable workplace" and was a good leader.

31. In October 2019, Carlson complained to Northwell's Human Resources department that he believed that Ortiz had discriminated against him because of his age. HR claimed to have investigated, but took no action.

32. In or about fall 2020, Northwell dismissed two senior doctors in Neurology. Upon information and belief, both were over 50 years old.

FIRST CAUSE OF ACTION
ADEA: Age Discrimination

33. Plaintiff repeats and realleges paragraphs 1 through 32 as if fully set forth herein.

34. By the acts and practices described above, Northwell discriminated against plaintiff in the terms and conditions of his employment on the basis of his age in violation of the ADEA.

35. Northwell knew that its actions constituted unlawful discrimination and/or acted with malice or reckless disregard for plaintiff's statutorily protected rights. These violations were willful within the meaning of the ADEA.

36. Plaintiff has suffered and will continue to suffer irreparable injury, and monetary damages as a result of defendant's discriminatory practices unless and until this Court grants relief.

## SECOND CAUSE OF ACTION
State Law: Age Discrimination

37. Plaintiff repeats and realleges paragraphs 1 through 36 as if fully set forth herein.

38. By the acts and practices described above, Northwell discriminated against plaintiff in the terms and conditions of his employment on the basis of his age in violation of the State Law.

39. Plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation, and other compensable damages as a result of defendant's discriminatory practices.

## THIRD CAUSE OF ACTION
City Law: Age Discrimination

40. Plaintiff repeats and realleges paragraphs 1 through 39 as if fully set forth herein.

41. By the acts and practices described above, Northwell discriminated against plaintiff in the terms and conditions of his employment on the basis of his age in violation of the City Law.

42. Defendant engaged in discrimination with willful or wanton negligence, with recklessness, and/or with a conscious disregard of plaintiff's rights or conduct so reckless that it amounts to such disregard.

1132817 v1

43. Plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation, and other compensable damages as a result of defendant's discriminatory practices.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter a Judgment:

(a) declaring the acts and practices complained of herein to be violations of the ADEA, the State Law, and the City Law.

(b) enjoining and permanently restraining these violations of the ADEA, and the State Law, and the City Law.

(c) directing defendant to take such affirmative steps as are necessary to ensure that the effects of these unlawful practices are eliminated and do not continue to affect plaintiff's employment opportunities;

(d) directing defendant to place plaintiff in the position he would have occupied but for defendant's unlawful treatment of him, and making him whole for all earnings and other benefits he would have received but for defendant's discriminatory treatment, including but not limited to wages, including back pay and front pay, bonuses, and other lost benefits;

(e) directing defendant to pay plaintiff compensatory damages, including damages for emotional distress, humiliation, pain and suffering, and injury to professional standing and reputation;

(f) directing defendant to pay plaintiff additional amounts as punitive damages;

(g) awarding plaintiff such interest as is allowed by law, and damages for any adverse tax consequences stemming from an award;

1132817 v1

  (h) awarding plaintiff the costs of this action, together with reasonable attorneys' fees; and

  (i) awarding such other and further relief as this Court deems necessary and proper.

DEMAND FOR A TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, plaintiff demands a trial by jury in this action.

Dated: New York, New York
   November 23, 2020

            VLADECK, RASKIN & CLARK, P.C.

By:  /s/
            Anne L. Clark
            Attorneys for Plaintiff
            565 Fifth Avenue, 9th Floor
            New York, New York 10017
            (212) 403-7300

1132817 v1